**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **PEDIATRIC NURSING CERTIFICATION BOARD,**<br><br>   **Plaintiff,**<br><br>v.<br><br>**GILLILAND ASSOCIATES, INC. D/B/A MELNIC CONSULTING GROUP, and LINDY LEE MOAKE,**<br><br>   **Defendants.** | **Civil Action No.:**<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Pediatric Nursing Certification Board ("PNCB"), by and through its undersigned counsel, brings this Complaint against Defendants Gilliland Associates, Inc. d/b/a Melnic Consulting Group ("Melnic"), and Lindy Lee Moake ("Moake (collectively, Melnic and Moake are referred to as "Defendants"), and alleges as follows:

### I.   NATURE OF THE ACTION

1.      PNCB brings this action to protect the integrity of the Pediatric Nurse Practitioners Acute Care board certification program and to recover the extensive damages caused by Defendants' scheme to undermine the board certification process for their own financial gain.

2.      Defendants Melnic and Moake, providers of commercial test preparation services for PNCB's Certified Pediatric Nurse Practitioner Acute Care Exam ("CPNP-AC® Exam" or the "Exam"), unlawfully copied and disseminated more than one-hundred (100) of PNCB's secure, trade secret and copyright-protected CPNP-AC Exam items to nurses seeking board certification as Acute Care Pediatric Nurse Practitioners. Defendants unlawfully obtained PNCB's CPNP-AC Exam items by mobilizing nurses who utilized their test preparation services to disclose and reconstruct the contents of the CPNP-AC Exam after taking the Exam in knowing violation of PNCB's copyright notices and confidentiality agreements to which every CPNP-AC Exam candidate must agree. Defendants then incorporated the memorized and reconstructed CPNP-AC Exam content into their commercial test preparation materials for later sale and distribution to future CPNP-AC candidates.

3.      PNCB sponsors, develops and administers the CPNP-AC Exam as an essential component of the Pediatric Nurse Practitioner Acute Care board certification program, the only national board certification program in the United States for nurses who provide advanced nursing care to children with acute, complex, critical, and chronic illness. Certification by PNCB as an Acute Care Certified Nurse Practitioner demonstrates that the nurse has the knowledge and skills deemed necessary to provide safe and competent acute care to a highly vulnerable population.

4.      Forty-six (46) states, including Texas, require a passing score on the CPNP-AC Exam as a condition of licensure to practice as an Acute Care Pediatric Nurse Practitioner in those states. Thus, PNCB board certification as a CPNP-AC serves as a proxy for licensure.

5.      CPNP-AC candidates with advance access to CPNP-AC Exam content unquestionably obtain an unearned advantage on the Exam, and their Exam scores are not a valid indicator that they have the knowledge and skills deemed necessary to provide safe and competent advanced nursing acute care to children.  The designation of CPNP-AC is rendered meaningless if the families of pediatric patients, their treating physicians, the hospital systems where they receive care, state boards of nursing and the public may be concerned that the nurses who achieved their CPNP-AC certification and state licenses were able to do so only because they obtained an unearned advantage on the CPNP-AC Exam.

6.      PNCB brings this action to stop Defendants from causing further harm to PNCB's CPNP-AC certification program, recover the extensive damages Defendants have already inflicted on PNCB, and, as further articulated in this Complaint, to assert claims against Defendants for:

  a.   copyright infringement in violation of the Copyright Act, 17 U.S.C. § 501 *et seq.*;

  b.   misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836;

c.   Misappropriation of trade secrets in violation of the Texas Uniform Trade Secrets Act;

d.   Tortious interference with existing contractual relationships under Texas law; and

e.   Civil conspiracy under Texas law.

## II.   PARTIES, JURISDICTION AND VENUE

7.   PNCB is a not-for-profit association with its principal place of business located at 9605 Medical Center Drive, Suite 250, Rockville, Maryland 20850.

8.   Defendant Gilliland Associates, Inc. d/b/a Melnic Consulting Group is a corporation organized and existing under the laws of Colorado, with its principal place of business located at 1864 Stockton St., San Francisco, California 94133. Despite conducting business in Texas, Melnic has failed to maintain an agent for service of process in the State of Texas, so may it be served through the Secretary of State for the State of Texas at Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079 (via mail) or 1019 Brazos Street, Austin, Texas 78701 (via delivery). The Secretary of State may mail a copy of citation to Melnic's agent for service of process in the state of Colorado: Toussaint & Coaty, P.C., 32065 Castle Court, Suite 150, Evergreen, Colorado 80439 or wherever it may be found.

9.   Melnic is subject to the personal jurisdiction in the United States District Court for the Northern District of Texas, Dallas Division, because Melnic purposefully availed itself of the benefits and protections of Texas in this District. Specifically, Melnic

conducts its commercial test preparation business in Dallas County, Texas, and solicits individuals working or living in Dallas County, Texas, to purchase its test preparation services, and collaborates in the promotion and production of live, in-person test preparation courses in Dallas County.  Melnic has entered into contractual relationships with individuals working or living in Dallas County, Texas, to provide the aforementioned services. Melnic has also knowingly entered into a business relationship pursuant to a contract with Lindy Lee Moake, a resident of the Northern District of Texas, in furtherance of Melnic's commercial test preparation activities throughout Texas and elsewhere.  Further, Melnic has engaged in tortious conduct in this District by infringing PNCB's copyrights, misappropriating Plaintiff's trade secrets and intentionally and tortuously interfering with contracts that exist between PNCB and other residents of this District.

10.     Upon information and belief, Defendant Lindy Lee Moake is an adult individual who resides at 527 McNear Drive, Coppell, Texas 75019, and is employed by Children's Medical Center Dallas, an academic healthcare system located at 1935 Medical District Drive, Dallas, Texas 75235. Upon further information and belief, Moake can be served with process through personal service at either her residence or employment address, or wherever she may be found.

11.     Moake is subject to personal jurisdiction in this District because Defendant resides and works in this District and has engaged in tortious conduct in this District by infringing Plaintiff's copyrights and misappropriating Plaintiff's trade secrets.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, § 1338(a), and § 1367(a).

13.     Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391 and 1400(a) because, Moake resides in this District, and a substantial part of the acts and omissions giving rise to the claims set forth below occurred in this District.

### III.   FACTS COMMON TO ALL COUNTS

**A.     PNCB and the CPNP-AC Exam**

14.     PNCB was founded in 1975 in Maryland as an unaffiliated not-for-profit association dedicated to the delivery of high-quality care to pediatric patients and their families through the development and maintenance of nationally accredited certification programs. PNCB was chartered by the American Academy of Pediatrics, the National Association of Pediatric Nurse Practitioners and the Association of Faculties of Pediatric Nurse Practitioners. PNCB initially established the Pediatric Nurse Practitioners ("PNPs") certification program and developed and began administering the board certification examination for Primary Care PNPs.

15.     In 2005, PNCB established the Certified Pediatric Nurse Practitioner Acute Care ("CPNP-AC") program and developed the corresponding certification Exam in

response to practice analysis research indicating a unique set of competencies that enabled acute care PNPs to provide family-centered and culturally respectful care for pediatric patients with acute, complex, critical, and chronic illness.  CPNP-ACs work closely with an interprofessional team to provide the highest level of evidence-based care for infants, children, adolescents, and young adults with life-threatening illnesses and organ dysfunction or failure. The most common practice settings for this group of PNPs are pediatric intensive care units and emergency rooms.

16.     PNCB is the only organization to offer national board certification for Acute Care PNPs, and the CPNP-AC Exam program is accredited by the National Commission for Certifying Agencies ("NCCA") through 2022.

17.     Since the launch of the CPNP-AC Exam, nearly 3,000 PNPs have earned the CPNP-AC credential by attaining a passing score on the CPNP-AC Exam, a secure, proctored, computer-based examination delivered at test centers nationwide. The CPNP-AC Exam contains confidential, copyright protected items not disclosed to anyone except those taking the Exam and those involved in creating it, all of whom are subject to agreements not to copy, disclose, reconstruct, share or discuss its content, and placed on notice of PNCB's copyrights in the Exams.

18.     Maintaining the integrity of the CPNP-AC program and ensuring the validity of CPNP-AC Exam scores are matters of serious public concern. The stakeholders in the CPNP-AC program are acutely ill children, adolescents, and young adults and their

families, the employers of CPNP-ACs, state regulators, graduate level educational programs and faculty that prepare CPNP-ACs, the membership organizations that count CPNP-ACs as members, and all care providers who hold the CPNP-AC credential. Certification as a CPNP-AC demonstrates to the public that the credential holder has the knowledge and skills deemed necessary to provide safe and competent care to a highly vulnerable population.

19.     To be eligible to sit for the CPNP-AC Exam, a nurse must have an active, unencumbered registered nurse license, have graduated from an accredited masters or doctoral program with a concentration of study in pediatric acute care in the role of a nurse practitioner, and have a minimum of 500 clinical practice hours. Passing the Exam is a requirement for licensure and therefore employment in 46 states, and it is required by a significant number of employers and professional malpractice insurance carriers in the remaining four states that do not require national certification as a condition of licensure.

20.     As a certification organization accredited by NCCA, PNCB is prohibited from developing and marketing its own test preparation services and has never formally endorsed or entered into any partnership or agreement with Melnic or any other company or organization that provides test preparation services.

**B.      Development of the CPNP-AC Exam.**

21.      Development of the CPNP-AC Exam—including the various forms that are used in administering the Exam and the individual exam items included in each form— is a scientifically rigorous, expensive and time-consuming process, involving multiple levels of development and review.

22.      Using a rigorous scientific methodology, PNCB compiles a number of CPNP-AC Exam forms, with each form consisting of passages and multiple-choice items developed and selected to assess candidate knowledge of each of the concepts tested in the CPNP-AC Exam. A multiple choice "item" often references a passage or graphic image, and consists of a question, or stem, and set of response options, three of which are typically incorrect, and one of which is the correct answer.  Each CPNP-AC Exam form contains 150 items that cover the body of knowledge and all subtopics tested in the Exam and 25 "field test" or experimental items (i.e. items that are being considered for future use and do not count toward the total score for that Exam), for a total of 175 items within each form.

23.      Field test items are newly developed, unscored items that are placed in the CPNP-AC Exam form to be analyzed for use as scored items in future CPNP-AC Exam forms.  Before an item can be included as a scored item in a test form, it must be field tested so that CPNP-AC Exam developers can effectively evaluate the measurement qualities of the item based on data gathered from candidates who interact with the item

during an Exam administration.  PNCB can only introduce a new scored item to an CPNP-AC Exam form after it has obtained sufficient performance data on the item from field testing, can establish an item difficulty level for the item for scoring purposes, and has concluded that the item provides a valid and reliable measure of the concepts it was developed to assess.

24.    From item writing, item field testing, item bias testing, and form construction, PNCB invests significant resources into the development and production of CPNP-AC Exam forms, a process that can take several years and costs PNCB approximately $150,000 on average for each scorable CPNP-AC Exam form.  After development, the scorable items in each Exam form may be administered multiple times before being retired.  However, even after Exam forms are retired, PNCB will deposit some of the items from retired CPNP-AC Exam forms back into its "item bank" and the items may be re-used on other CPNP-AC Exam forms at a later date.  Accordingly, each item and each CPNP-AC Exam form has substantial value to PNCB.

25.    The secure contents of each CPNP-AC Exam are trade secrets, and PNCB goes to great lengths to protect the security and confidentiality thereof. In addition to other security measures designed to keep CPNP-AC Exam content secret that are described in greater detail below, all PNCB employees, contractors, and vendors who either develop or are exposed to CPNP-AC Exam content in the course of carrying out their respective duties on behalf of PNCB, enter into confidentiality agreements with

PNCB that require them to maintain the confidentiality of all CPNP-AC Exam content in perpetuity. Each CPNP-AC candidate also enters into a confidentiality agreement with PNCB, described in greater detail below, that requires them to keep CPNP-AC Exam content secret in perpetuity.

26.     To promote fairness and protect the validity of the Exam, PNCB has created policies to ensure that candidates do not copy or share CPNP-AC Exam content or otherwise obtain advance access to exam questions.

**C.     Applying for Certification as a CPNP-AC and Taking the Exam**

27.     During the CPNP-AC application process, candidates are required to read and agree to the PNCB Honor Statement Attestation presented to them at the time they submit their applications on the PNCB website.  As part of the process, candidates must also affirm that they have read the current version of the *Candidate Handbook*—the official policy and procedure guide to PNCB certification exams—and that they agree to the policies contained in the Candidate Handbook.  Finally, the PNCB Honor Statement Attestation requires candidates to confirm acceptance of PNCB's Code of Ethics.

28.     The PNCB Honor Statement Attestation provides, in pertinent part:

NON-DISCLOSURE OF EXAM CONTENT:

•    I understand that all examination materials are copyrighted and are the sole property of the PNCB. I agree not to disclose or communicate about exam questions with my colleagues, supervisors, mentors, or teachers. Violation of this confidentiality may jeopardize my certification or opportunity to become certified in the future.

- • I understand that exam content will not be available for review by candidates either before or after the examination.

29.    The Candidate Handbook that includes PNCB's board certification exam

policies that candidates must read and accept provides, in pertinent part:

**Exam Copyright and Confidentiality**

All examination questions are the copyrighted property of PNCB. It is forbidden under federal copyright law to copy, reproduce, record, distribute, or display these examination questions by any means, in whole or in part. Doing so may subject you to severe civil and criminal penalties. As an exam candidate, you agree not to disclose information about test questions and answers in any way. This includes talking about questions with your colleagues, supervisors, mentors, or teachers. Violation of this confidentiality agreement can jeopardize your certification or opportunity to become certified in the future. Protect yourself, your colleagues, and the credential by not discussing test questions with anyone.

**Misconduct or Irregular Behavior**

Irregular behavior is attempted violation(s) of the rules regarding any part of the examination process. Irregular behavior includes but is not limited to:

- • Violations before testing:
    * * * *

    - o Seeking information about exam items and/or answers from previous candidates or formal or informal test preparation groups.
    * * * *

- • Violations after testing:
    - o Reproducing exam items, by any means, including reconstruction from memory.
    - o Communicating about exam items and/or answers with other candidates, potential

candidates or formal or informal test preparation groups.

\* \* \* \*

- Consequences of Irregular Behavior
  - If evidence is found of a breach of exam materials before the exam administration, and evidence suggests that the behavior is organized and/or may involve a number of candidates, PNCB reserves the right to cancel the exam administration.
  - If evidence is found of a breach in the security of exam materials after an exam administration, and evidence suggests that the behavior was organized and/or may have involved a number of candidates, PNCB reserves the right to nullify the exam results of some or all candidates.

\* \* \* \*

  - If after PNCB's review of the available information it is determined that irregular behavior has occurred, the violator's exam results will be invalidated. The candidate will either be prohibited from taking future PNCB certification exams or special procedures will be implemented for future exams. PNCB may choose to provide notice of the sanctions imposed to entities with a need to know such as a state board of nursing. Exam fees will not be refunded and PNCB may also pursue a legal remedy against the candidate(s).

  - If the irregular behavior involves unauthorized reproduction and/or distribution of exam materials or dissemination of exam content, PNCB will pursue all legal means available to protect the copyrighted materials.

30.    The PNCB Candidate Handbook is a publicly available document posted

on          PNCB's          website          at          the          URL

https://pncb.org/sites/default/files/resources/PNCB_Exam_Candidate_Handbook.pdf,

and is easily located via a link on the PNCB web page entitled, "CPNP-AC Exam Administration, What to expect," located at URL https://pncb.org/cpnp-ac-exam-administration.

31.     On the day of the administration of the CPNP-AC Exam at the test center, before candidates are even allowed to access the CPNP-AC Exam, candidates must agree, by clicking a box labeled "accept," to an additional non-disclosure agreement that appears on the computer screen. The candidate agrees, among other things, that:

> This exam is confidential and proprietary. It is made available to you solely for the purpose of assessing your proficiency. You are expressly prohibited from disclosing, publishing, reproducing, or transmitting this exam, in whole or in part, in any form or by any means, verbal or written, electronic or mechanical, for any purpose, without the prior written permission of the Pediatric Nursing Certification Board. Violation of this confidentiality may jeopardize your opportunity to become certified or maintain certification.

32.     After taking the CPNP-AC Exam, but before the candidate is permitted to complete the testing process, each candidate's computer screen displays the following message:

> All examination questions are copyrighted and the property of PNCB. Your agreement to the non-disclosure and general terms of use at the beginning of this session prohibits you from disclosing information about this examination in any way. Violation of this confidentiality will jeopardize your opportunity to become certified or maintain certification.

33.     PNCB utilizes additional security measures to ensure fairness and protect the security, confidentiality and integrity of the CPNP-AC Exam on exam days that include:

    (a)    ensuring that all test centers are staffed by no less than two professional test center administrators trained in the CPNP-AC security rules ("Test Center Administrator" or "TCA");

    (b)    verifying identity using government-issued identification documents before admitting candidates to the exam room;

    (c)    confirming the candidate's CPNP-AC registration through PNCB's registration system;

    (d)    requiring candidates to provide a hand signature at check in, and prior to every entrance to and exit from the exam room, including before and after all breaks;

    (e)    taking an exam-day photo of each candidate;

    (f)    requiring candidates to remove all physical items such as phones, notes, jackets, hats, watches, and other prohibited items, power off and store phones in sealed cell phone bags, and store all such items in their lockers prior to entering the exam room;

    (g)    inspecting eyeglasses and any large or unusual jewelry;

    (h)    regularly monitoring the conduct of candidates inside the exam room; and

    (i)    conducting and recording video and audio surveillance of the check-in area and exam room at all times.

**D.     PNCB Received a Tip That the Exam Was Breached and Began an Investigation**

34.     In February, 2019, PNCB received an email from a nurse (the "Whistleblower") who explained that she had successfully passed the CPNP-AC Exam a

few days earlier and a friend who was preparing to take the CPNP-AC Exam requested that the Whistleblower review a document that contained what she thought were practice questions that might help her prepare for the CPNP-AC Exam.  The Whistleblower's friend wanted the Whistleblower to look at the practice exam content to get her opinion about whether the questions contained in the document would be useful material to study. The Whistleblower further explained in her email to PNCB, "When I opened the document, I recognized [that the] majority of the questions [were] from the ACTUAL board test I just took." The Whistleblower forwarded the document she had received to PNCB along with the text message communications she exchanged with her friend about the document, which was titled "*2016 Kelsey ACPNP Board Questions*," (the "Kelsey Document").  The heading at the top of the first page of the Kelsey Document reads: "AC-PNP Board exam questions," and the document includes 137 numbered questions with purportedly correct answers under each question.   A number of the answers were followed by a question mark.

35.    PNCB analyzed and compared the items in the Kelsey Document to its actual CPNP-AC Exam items, and determined that more than one-hundred (100) of the items in the Kelsey Document were substantially similar to actual, trade secret, copyright-protected CPNP-AC Exam items contained across four (4) different forms of the CPNP-AC Exam.

36.     Two examples of the infringing items contained in the Kelsey Document compared to the original items contained in the actual CPNP-AC Exam are set forth below.  "NS" is the industry-accepted abbreviation for normal saline.

| Match with Item # | Seq. in KD | KELSEY DOCUMENT | ACTUAL PNCB CPNP-AC EXAM ITEM | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Verbatim Text from Kelsey Doc | Stem | A | B | C | D | Answer |
| 325 | 40 | T-cell lymphoma scenario with thymus involvement. What presenting in the clinical presentation? (Choice includes leukocytosis, mediastinal mass) answer: Mediastinal mass | Which of the following is the MOST likely clinical presentation in an adolescent diagnosed with T-cell lymphocytic lymphoma with thymic involvement? | leukocytosis | anemia | mediastinal mass | neutropenia | C. |
| 534 | 72 | Child has injury from football practice, now has 106F temp. Which fluid to give? (Options includes NS with Tylenol; 1/2 NS with Tylenol; NS with cool pack; D5NS with Tylenol) answer: NS with cool packs | A 14-year-old male presents with a temperature of 106.1&deg; F (41.2&deg; C) after summer football practice.  Which of the following is the appropriate initial management? | 0.9% normal saline and acetamino-phen | 0.9% normal saline infusion and cold packs | D5 0.45% normal saline and acetamino-phen | D5 0.45% normal saline infusion and cold packs | B. |

37.     PNCB promptly withdrew the Exam from all testing centers and launched a comprehensive investigation to determine the source of the Kelsey Document and scope of the breach of PNCB's trade secret and copyright-protected CPNP-AC Exam items.

38.     The metadata in the Kelsey Document showed that "Lindy Moake" last saved the document in late 2016.

39.     Through the investigation, PNCB determined that the primary distributor of the Kelsey Document was Moake, who emailed the document to a number of nurses preparing for the CPNP-AC Exam after receiving it from Kelsey.  Then, as might be predicted, nurses who received the Kelsey Document from Moake further disseminated it to their peers preparing for the CPNP-AC Exam.

40.     PNCB's investigation also revealed that Moake worked with Melnic in developing and providing CPNP-AC test preparation services and materials to CPNP-AC candidates, as described in greater detail below.

**E.     Melnic's and Moake's CPNP-AC Exam Review Services**

41.     Melnic is a nationwide job placement firm for advanced practice registered nurses and physician assistants. Melnic advertises itself has having relationships with hiring managers at "the nation's leading hospitals and clinics" and offers placement services to medical employers and employees alike.

42.     Melnic also owns and operates the "AC+PNP Exam Review," a web-based commercial test preparation service available at URL: https://ac-pnp.com. The purpose of the AC+PNP Exam Review, as advertised by Melnic, is to "prepare graduates of acute care PNP programs for the Pediatric Nursing Certification Board (PNCB) acute care certification exam."

43.     Remarkably, Melnic offers a "100% money back guarantee" to CPNP-AC candidates who fail the CPNP-AC Exam after using Melnic's services.  A screenshot from the Melnic website reflecting this guarantee is provided below:



44.     The Melnic AC+PNP Exam Review website  describes Moake as the "Exam

Prep Author." Melnic represents on the website:

> Over the years [Moake] has developed a database of Acute
> Care PNP board exam questions, answers and rationale.  Her
> dedication to the education and success of her students
> includes live offerings of this review to her graduating
> students twice a year.   She also tutors students from other
> ACPNP programs who have not been successful with their
> ACPNP boards.   She has been successful in this venture,
> seeing 100% of these students who reviewed her materials,
> pass their ACPNP board exam.

A screenshot of Moake's profile from the Melnic website is copied below:



45.     As noted in Moake's profile on the Melnic website, Moake is a senior faculty

member of the Pediatric Acute Care Nurse Practitioner Program at the University of

Texas at Arlington, and practices as a nurse manager at Children's Health in Dallas, Texas.

46.     Moake obtained CPNP-AC certification in 2008. Accordingly, Moake is aware that the contents of the CPNP-AC Exam are confidential and copyright-protected. Before taking the CPNP-AC Exam in 2008, Moake was required to certify that she understood that "[a]ll examination questions are the copyrighted property of PNCB." She further agreed that "[i]t is forbidden under federal copyright law to copy, reproduce, record, distribute or display these examination questions by any means, in whole or in part. Doing so may subject you to severe civil and criminal penalties."

47.     Jill Gilliland ("Gilliland") is Melnic's founder and president. Gilliland has worked in the recruiting industry for over twelve years and claims to have expertise in the pediatric nursing field and industry knowledge of children's hospitals, physicians' groups, and pediatric clinics. Gilliland also describes herself as the President of Melnic's AC-PNP Exam Review, which she says she "created, designed, managed, and developed." Gilliland, on behalf of Melnic, worked directly with Moake in developing Melnic's CPNP-AC preparation services.  Melnic's description of the "database of Acute Care PNP board exam questions, answers and rationale" that Moake "developed" "over the years" demonstrates that Gilliland and Melnic had full knowledge that the content incorporated into Melnic's test prep materials was compiled by Moake from candidates who memorized and reconstructed content from PNCB's trade secret and copyright-

protected CPNP-AC Exams.  In addition to working with Moake to develop and manage the web-based component of Melnic's CPNP-AC Exam prep services, Gilliland also collaborated with Moake in producing the in-person review courses taught by Moake in Texas.  Gilliland and Melnic also referred CPNP-AC candidates to Moake if they failed the CPNP-AC Exam, with the intention and knowledge that Moake would provide them with additional reconstructed CPNP-AC Exam content that Moake had collected from other CPNP-AC candidates over the years.

48.     The Melnic AC+PNP Exam Review website contains descriptions of the requirements imposed by PNCB on candidates for the CPNP-AC Exam and includes verbatim copies of portions of PNCB's website pages that describe candidate policies for the CPNP-AC Exam.  The Melnic AC+PNP Exam Review website also provides links to PNCB's website where CPNP-AC Exam requirements and candidate policies are publicly displayed. As set forth in greater detail in paragraph 29 of the Complaint, PNCB's website publicly displays information about the confidential and copyright protected nature of the CPNP-AC Exam and requirements regarding a candidate's duty to keep the content of the CPNP-AC Exam confidential.

49.     Melnic's AC-PNP Exam Review website includes e-commerce functionality, so that candidates can sign up for the service and pay by a credit card directly though the website.  Melnic offers customers three different packages of services, ranging in price from $157.85 for access to "Three AC-PNP Practice Exam Modes," up to

$375.00 for the "Practice Exams" plus the "Interactive Review Course."  The service offerings made available through the website are depicted in the screenshot below:



50.     Based upon the information received in the investigation, PNCB purchased access to the "Three AC-PNP Practice Exam Modes" offered on Melnic's website.  PNCB's analysis of the Melnic practice exams offered through the website revealed that the

Melnic "Practice Exam" content alone included a total of twenty-eight (28) items that were substantially similar to actual CPNP-AC Exam items.

51.     PNCB accordingly notified Melnic in writing of the infringing content and asked Melnic to remove those infringing items from the website.  Despite contending that the so-called practice test items were not infringing, Melnic represented to PNCB that they removed the twenty-eight items from the website.

52.     PNCB has not purchased or been able to access or review the additonal CPNP-AC Exam preparation materials offered as part of the "Interactive Review Course" on the Melnic website.  However, on information and belief, the additional Melnic CPNP-AC Exam preparation materials included in the "Interactive Review Course" contain a significant volume of additional CPNP-AC Exam content collected by Moake on behalf of Melnic with Melnic's knowledge and inducement, in violation of PNCB's exclusive rights.

53.     Moake and Melnic also collaborate on the production of in-person CPNP-AC Exam review courses given in Dallas, Texas, among other places, that candidates must pay a fee to attend.  At the in-person review courses, Moake distributes electronic and paper test preparation materials, including content that is substantially similar to PNCB's trade secret and copyright-protected CPNP-AC Exam content.  As demonstrated in further detail below, Melnic later posts media and content from the in-person review

CPNP-AC Exam review courses taught by Moake on the Melnic website, and provides access to those materials for its paying customers.

**F.     The Brain Dump Cycle**

54.     Moake and Melnic used a process known as "brain dumping" to collect CPNP-AC Exam content from candidates who recently took the Exam, which they then incorporated into Melnic's commercial test preparation materials to make it available to Melnic's paying customers.  Melnic and Moake also distributed brain dumped CPNP-AC Exam content on a one-on-one basis to Melnic customers poised to take the CPNP-AC Exam, particularly in instances where those customers previously failed the Exam.

55.     Moake first received the Kelsey Document in 2016, shortly after "Kelsey" took the CPNP-AC Exam for the fourth time.  The email in which Moake first received the Kelsey Document is set forth below:

From: Kelsey ▮▮▮▮▮▮▮ REDACTED ▮▮▮▮▮▮▮
Subject: information
Date: November 1, 2016 at 10:48:36 AM CDT
To: lindy.moake@childrens.com

Lindy,

I had many of the same questions that you sent me and we talked about. Here are all the questions I remember.  Thanks again and if you or anyone else needs any other information just let me know! Have a great week

Kelsey

("questions" word doc attached to email)

56.     As demonstrated in the email above and throughout other examples of email correspondence contained in this Complaint, Moake used her Children's Health email account to send and receive numerous emails that contained content that infringed and misappropriated PNCB's trade secret and copyright-protected CPNP-AC Exams.

57.     Moake received CPNP-AC Exam content from other CPNP-AC candidates to whom she clearly articulated what she intended to do with the brain dumped content upon receiving it, as demonstrated in the email below.



58.     Further investigation by PNCB revealed that Moake also directly solicited CPNP-AC Exam content from CPNP-AC candidates who recently took the Exam in order to refresh the "database of Acute Care PNP board exam questions, answers and rationale" that Melnic highlighted on its Exam Review website.  In this way, Moake and Melnic could ensure that their paying customers continued to obtain an unearned advantage on the CPNP-AC Exam as the Exam was modified from time to time by PNCB. Examples of these solicitation emails sent by Moake are provided below:



**From:** Lindy Moake
**Sent:** Wednesday, November 14, 2018 8:57 AM
**To:** REDACTED
**Subject:** ACPNP additional study info

　　Here's the additional study materials I promised you.  Please take a pic of what you
remember so we can get you the correct answers

From: REDACTED
Date: January 16, 2019 at 1:15:54 PM CST
To: Lindy Moake <LINDY.MOAKE@childrens.com<mailto:LINDY.MOAKE@childrens.com>>
Subject: Re: questions

This email was sent from an external source. Don't click links or open attachments from an unknown or unexpected sender. Report suspicious e-mails using the Phish-Alert button in Outlook, if available, or forward to spam@childrens.com<mailto:spam@childrens.com>.
I am sure they will come to me as the day goes on.
Right now, I can remember one that said something about a study with only 40 participants and what kind of research error with this be,     like type 1, 2 selection and something else. I had no clue.

the antibiotic choice for n. meningitis was not pcn g.

one was which of these diagnosis need endocarditis prophylaxis  asd, vsd and 2 with valves

Most common lethal toxic ingestion in pediatrics?

10yo child with no immunization before. What to give now? (Choices are MMR, IPV; MMR, Tdap; MMR, DTap, IPV) _ was not sure of tdap vs dtap

I will think of more and send your way. On my exam the first 25 questions were ones that I felt were not covered as much and I wondered if they were the practice non graded questions. I will try to think of what they asked.

On Wed, Jan 16, 2019 at 9:35 AM Lindy Moake <LINDY.MOAKE@childrens.com<mailto:LINDY.MOAKE@childrens.com>> wrote:
Oh THAT IS AWESOME!!!!! Made my day.  Once the happiness has subsided, please list any topics I did not cover or you felt should be covered and email them to me.  It helps me write new questions for the course.

Again, congratulations!

[cid:169c96512645b16b21]<http://www.childrens.com/>

Lindy Moake
RN, MSN, PCCNP
Clinical Manager, APS Services
Heart Center
O: 214.456.7794
C: 972.741.2226
E:lindy.moake@childrens.com<mailto:lindy.moake@childrens.com>

1935 Medical District Drive I Mailstop B3.405  I Dallas, TX 75235

　　59.　　In one email, Moake sent a copy the Kelsey Document to 24 CPNP-AC

candidates who had just attended the in-person CPNP-AC Exam review course put on

by Moake and Melnic, and explained how it should be used to prepare for the Exam.

Moake wrote, "Please note, I've not checked all the answers and thankfully, the document

labeled Kelsey's questions, she italicized the ones she was not sure of.  One example is

the diabetic question which we discussed and felt the answer should be add dextrose to the IV solution."   Moake closed her email by wishing the candidates good luck on the Exam, and urging them, "PLEASE let me know how you do and if you would like to add to the list of questions."   The email is displayed below:

From: **REDACTED**
Subject: Fwd: Additional questions from student who recently took and passed boards plus jeopardy game questions
Date: May 21, 2019 at 1:48 PM
To: dudenlisa73@gmail.com

REDACTED

Begin forwarded message:

From: Lindy Moake <LINDY.MOAKE@childrens.com>
Date: October 23, 2017 at 2:10:31 PM EDT

# REDACTED

Cc: "Moake, Lindy L" <moake@uta.edu>
Subject: Additional questions from student who recently took and passed boards plus jeopardy game questions

To all;

Thank you so much for coming to the ACPNP review course. I'm sure it was long and many times difficult to focus but I appreciated your commitment to wanting to pass your ACPNP boards. I've attached the documents I promised you. Please note, I've not checked all the answers and thankfully, the document labeled Kelsey's questions, she italicized the ones she was not sure of. One example is the diabetic question which we discussed and felt the answer should be add dextrose to the IV solution. I've also attached the jeopardy game. The one we played and two additional versions.

Good Luck and PLEASE let me know how you do and if you would like to add to the list of questions.
Lindy

**Please consider the environment before printing this e-mail**

This e-mail, facsimile, or letter and any files or attachments transmitted with it contains information that is confidential and privileged. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law and regulations. If you have received this information in error, please notify us via e-mail at privacy@childrens.com. Children's Health System of Texas and its affiliates hereby claim all applicable privileges related to this information.



2016 Kelsey
ACPNP...s.docx

60.     Moake also personally emailed infringing and misappropriated CPNP-AC Exam content to CPNP-AC candidates after they initially failed the Exam and were preparing to take it again. Examples of Moake's emails to repeat Exam candidates are provided below. PNCB has confirmed that attachments to the below emails include content that is substantially similar to PNCB's CPNP-AC Exam content:

-----Original Message-----
From: Lindy Moake
Sent: Thursday, January 03, 2019 3:04 PM
█████████ REDACTED █████████
Subject: RE: PNP-AC certification exam

█ REDACTED █

I'm so sorry you did not pass your exam. I've attached are some extra study materials. Some of these were sent to me by students who took the exam before and sent me things they remembered.

Once you were complete with the exam, did you write down questions you may or may not have struggled with. Sometimes it's good to do that then compare for the correct answer. I'm happy to help you going forward. Please let me know what areas you feel you struggled with.

-----Original Message-----
█████████ REDACTED █████████
Sent: Thursday, January 03, 2019 2:02 PM
To: Lindy Moake <LINDY.MOAKE@childrens.com<mailto:LINDY.MOAKE@childrens.com>>
Subject: PNP-AC certification exam

[This email was sent from an external source.]

Good afternoon,

This is █ REDACTED █ I was in your Clinical Practicum course last semester and took your review course in October. I took my boards today and failed. I'm just looking for guidance on how to approach re-testing. I'm not really sure if I could've studied more, I really felt as if I knew the information. I'm just at a lost for how tackle this. Thank you for your time.

█ REDACTED █

Sent from my iPhone
Please consider the environment before printing this e-mail

This e-mail, facsimile, or letter and any files or attachments transmitted with it contains information that is confidential and privileged. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law and regulations. If you have received this information in error, please notify us via e-mail at privacy@childrens.com<mailto:privacy@childrens.com>. Children's Health System of Texas and its affiliates hereby claim all applicable privileges related to this information.

      

| Acute Care Board...ions.txt | 2018 AC-PNP additio...ill.pptx | 2018 AC-PNP additio...ns.pptx | 10-22 Board prep eval.doc | 2016 Kelsey ACPNP...s.docx | Copy of Lindy Review...rds.xls | Self Study Guide.docx |

**From:** Lindy Moake
**Sent:** Wednesday, November 14, 2018 8:57 AM
**To:** ██████████ **REDACTED** ██████████
**Subject:** ACPNP additional study info

Here's the additional study materials I promised you.  Please take a pic of what you remember so we can get you the correct answers

61.     The excel spreadsheet for the creation of flash cards (as referenced in the email above) includes at least seventy-five (75) items that are substantially similar to items that are contained in PNCB's trade secret, copyright-protected CPNP-AC Exam forms, including many of the CPNP-AC Exam items found in the Kelsey Document.

62.     Moake emailed the spreadsheet containing trade secret, copyright-protected CPNP-AC Exam content to Gilliland and other employees at Melnic so that the infringing materials could be incorporated into the Melnic Exam Review materials, as established in the email below.

**From:** Lindy Moake
**Sent:** Tuesday, September 27, 2016 6:31 PM
**To:** Jill Gilliland (jill@melnic.com); Mike Maddalena (mike@melnic.com); Mike Maddalena (mike@melnic.com)
**Subject:** Flash Cards

I'm attaching an excel sheet of 275 questions that can be used for flash cards.  The program I used is called Flashcards Deluxe (OrangeOrApple.com).  I added a first column to this powerpoint to identify body system.  This should only be used if you want to group the flashcards into like categories.  The student would not want to have this as part of the excel file used to create the flashcards because when you sync your phone to this program, you  can only have two columns in the excel document; one mimic the question or front of the flashcard and the other the answer or back of the flash card.

Jill – if you want to have this on the website for purchase that's fine with me.  Lets talk soon.

63.     Gilliland also directly emailed CPNP-AC Exam content to Melnic customers who failed the Exam. In fact, Gilliland emailed Kelsey, the author of the Kelsey Document, before she took the Exam in 2016, and sent her Melnic's purported test prep materials that included PNCB's trade secret, copyright-protected CPNP-AC Exam content. Gilliland's email to Kelsey also establishes that Melnic collaborates with Moake in producing the live, in-person review courses featuring Moake in Dallas, Texas, and that the materials from the live, in-person review courses are then made available through Melnic's website to paying customers.



G.      **The Repercussions of Defendants' Illicit Scheme.**

64.     Shortly after discovering the breach of the CPNP-AC Exam, PNCB suspended all CPNP-AC testing in an effort to preserve the integrity of the board certification process.

65.     The four (4) copyright-protected CPNP-AC Exam forms that were breached as a result of Defendants' infringing conduct, and all of the Exam items contained within those forms, are now unusable, because they have been utterly stripped of their measurement value.

66.     PNCB was forced to expend significant financial and human resources to quickly develop and validate new CPNP-AC Exam forms with items that were not breached, to ensure that future Exam results will be valid and trustworthy.

67.     PNCB was also forced to expend significant financial and human resources to investigate this matter in order to determine the full scope of the breach and mitigate any further harm to PNCB and the CPNP-AC program.

68.     PNCB's investigation, which included a comprehensive scientific analysis of the test response data for all CPNP-AC candidates who took the Exam since 2016, demonstrated that a number of nurses who received passing scores on the CPNP-AC Exam in that time period obtained an unearned advantage on the Exam because they received advance access to PNCB's breached CPNP-AC Exam content as a direct result of Defendants' unlawful conduct. Accordingly, PNCB will have to invalidate the Exam

scores of a number of those nurses, and they will have to take the CPNP-AC Exam again to ensure that they meet the knowledge standards required of CPNP-ACs.

69.     Defendants have financially damaged PNCB in an amount exceeding one-million dollars, which includes all of the costs and expenses that have been incurred and will be incurred by PNCB as a direct and proximate result of Defendants' unlawful conduct.

70.     Further, PNCB's reputation in the healthcare provider and patient communities as a trusted provider of certification services may be imperiled because of Defendants' tortious acts.

<u>COUNTS</u>

**Count One:**

**Copyright Infringement in Violation of 17 U.S.C. § 501 *Et. Seq.***

71.     PNCB hereby repeats and incorporates each and every allegation of Paragraphs 1-70 of this Complaint as though fully set forth herein.

72.     Each CPNP-AC Exam form is a discrete secure test developed by PNCB as an original work of authorship, which is copyrightable under 17 U.S.C. § 102. Each secure test is created from a group of secure test items.

73.     The United States Copyright Office issued Certificates of Registration for each of PNCB's CPNP-AC Exam forms, including Registration Nos. TX0008731975, TX0008731976, TX0008731165, and TX0008731978 (the "CPNP-AC Exams").

74.     As lawful owners of the copyrights in the CPNP-AC Exams, PNCB is entitled to, *inter alia*, the exclusive rights to do and to authorize the reproduction, distribution, display of and the preparation of derivative works based on the copyrighted work. 17 U.S.C. § 106.

75.     Defendants copied, distributed, and displayed content that is substantially similar to the content contained in the CPNP-AC Exams, and created derivative works based on the CPNP-AC Exams, as described in paragraphs 40-59 of the Complaint.

76.     Defendants' unauthorized copying, distribution, and display and creation of derivative works based on the CPNP-AC Exams in interstate commerce constitutes an actual and threated infringement of PNCB's copyrights.

77.     The foregoing conduct on the part of Defendants constitutes willful copyright infringement in violation of the Copyright Act. 17 U.S.C. § 101 *et seq.* Specifically, Defendants duplicated and published substantially similar copies of the items contained in the CPNP-AC Exams to candidates for the CPNP-AC Exam. Defendants did so for their own financial gain.

78.     Defendants had full knowledge of PNCB's rights in and to the CPNP-AC Exams and the secure test items contained therein when they copied, displayed and created derivative works therefrom.

79.     Defendants Melnic and Moake knew that the CPNP-AC test preparation content that Melnic and Moake distributed through the Melnic website, via email and at

in-person test preparation courses in Texas included content that was substantially similar to and derived from actual CPNP-AC Exams.

80.     Defendant Melnic had the right and ability to supervise the infringing conduct of Moake and Melnic's employees, and a direct financial interest in the infringing activities described in this Complaint.

81.     Defendant Melnic also induced and materially contributed to Defendant's Moake's infringing conduct.

82.     By reason of the foregoing acts of copyright infringement and threatened continued copyright infringement by Defendants, PNCB has sustained substantial damages.

83.     Defendants' copyright infringements have caused PNCB to suffer irreparable harm for which no adequate remedy at law exists.

84.     Pursuant to 17 U.S.C. § 502, PNCB seeks an injunction to permanently restrain Defendants' infringement of PNCB's copyrights in the CPNP-AC Exams.

**Count Two:**

**Misappropriation in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836**

85.     PNCB hereby repeats and incorporates each and every allegation of Paragraphs 1-70 of this Complaint as though fully set forth herein.

86.     Each CPNP-AC Exam form contains trade secrets that consist of passages, graphic images, questions, incorrect answer choices, and correct answers that include

research information and psychometric techniques used for evaluating and assessing the competency of a candidate to provide acute pediatric care, including care for children with acute, complex, critical, and chronic illness study, which are not generally known to the public (the "CPNP-AC Exam Trade Secrets").

87.    CPNP-AC Exam forms containing the CPNP-AC Exam Trade Secrets are used by PNCB and candidates in interstate commerce, as the CPNP-AC Exam is administered throughout the United States.

88.    Candidates derive significant economic value from passing CPNP-AC Exam scores, including state licensure and career opportunities and increased compensation made available to them by virtue of passing the CPNP-AC Exam and obtaining their certification and licensure.

89.    If a candidate had advance knowledge of the contents of the CPNP-AC Exam, the candidate could achieve a passing score on the CPNP-AC Exam that would not be a valid indicator of the candidate's knowledge or competency, but would nonetheless result in the candidate receiving certification, thereby allowing a pediatric nurse practitioner who has not validly obtained certification to obtain a license and employment and to provide advanced nursing acute care to a vulnerable population, our nation's critically or chronically ill children.

90.    The CPNP-AC Exam Trade Secrets derive actual and/or potential independent economic value from not being generally known to and not being readily

ascertainable by proper means by another person who can obtain economic value from the disclosure or use of the information.

91.     PNCB takes extensive measures to maintain the secrecy of the CPNP-AC Exam Trade Secrets.

92.     Each and every candidate agrees to maintain the confidentiality of CPNP-AC Exam content before they are allowed to take the Exam. Such Agreement imposes upon the candidate a continuing duty to keep the contents of the CPNP-AC Exam confidential.

93.     With knowledge of the trade secret status of the CPNP-AC Exam, Moake, on her own and on behalf of Melnic, and with Melnic's knowledge, solicited candidates to provide Defendants with PNCB's CPNP-AC Exam Trade Secrets in violation of the candidates' agreements with PNCB. Defendants successfully obtained PNCB's CPNP-AC Exam Trade Secrets, and for their own financial gain, provided PNCB's CPNP-AC Exam Trade Secrets to paying CPNP-AC candidates through Melnic's and Moake's test prep services. Defendants knowingly, willfully, and maliciously acquired and disclosed the CPNP-AC Exam Trade Secrets through improper means and knew that they had used improper means to do so.

94.     The foregoing acts of Defendants constitute willful and malicious misappropriation of the CPNP-AC Exam Trade Secrets under 18 U.S.C. § 1836.

95.     As a direct and proximate result of Defendants' willful and malicious misappropriation of trade secrets, PNCB has sustained substantial damages.

## Count Three:

## Misappropriation in Violation of the Texas Uniform Trade Secrets Act, TEX. CIV. PRAC. & REM. CODE § 134A.001 *Et Seq.*

96.     PNCB hereby repeats and incorporates each and every allegation of Paragraphs 1-70 of this Complaint as though fully set forth herein.

97.     The foregoing acts of Defendants constitute willful and malicious misappropriation of the CPNP-AC Exam Trade Secrets under TEX. CIV. PRAC. & REM. CODE § 134A.001 *et seq.*

98.     As a direct and proximate result of Defendants' willful and malicious misappropriation of trade secrets, PNCB has sustained substantial damages.

## Count Four: Tortious Interference with Existing Contracts

99.     PNCB hereby repeats and incorporates each and every allegation of Paragraphs 1-52 this Complaint as though fully set forth herein.

100.    PNCB had existing contracts subject to interference. Specifically, PNCB has existing contracts with each candidate for the CPNP-AC Exam, which impose upon the candidates' duties to maintain the confidentiality of the content of the CPNP-AC Exam.

101.    Defendants intentionally and willfully interfered with those contracts. Specifically, Defendants, with knowledge of the candidates' contractual duties to maintain the confidentiality of the content of the CPNP-AC Exam, solicited candidates to

provide CPNP-AC Exam content to Defendants in violation of those contractual obligations. Following such solicitation, Defendants actually obtained trade secrets and copyrighted CPNP-AC Exam content from candidates, in direct violation of those candidates' agreements with PNCB. Defendants then disclosed the CPNP-AC Exam content to other candidates before those other candidates took the CPNP-AC Exam.

102.    As a direct and proximate cause of Defendants' interference with the confidentiality agreements between PNCB and candidates, PNCB has incurred substantial damages.

### Count Five:

### Civil Conspiracy

103.    PNCB hereby repeats and incorporates each and every allegation of Paragraphs 1-70 of this Complaint as though fully set forth herein.

104.    Defendants Moake and Melnic, are a combination of two or more persons.

105.    Defendants had an objective with a lawful purpose to be accomplished through unlawful means. Specifically, Defendants had an objective to develop and administer a test prep services with the purpose of offering the services, for a fee, to candidates who desire to take the CPNP-AC Exam.

106.    Defendants had a meeting of the minds to accomplish their objective through unlawful means. Specifically, Defendants desired to obtain actual CPNP-AC Exam content to include in their test preparation materials to increase the likelihood that

candidates would purchase their services and to increase the likelihood that their customers would obtain an unearned advantage on the CPNP-AC Exam. Defendants had a plan to obtain PNCB's trade secret and copyrighted CPNP-AC Exam content by soliciting candidates for the CPNP-AC Exam to reconstruct and forward CPNP-AC Exam content so that it could be incorporated into their commercial test prep materials.

107.    Defendants took overt steps to accomplish this purpose through unlawful means. Moake solicited candidates for the CPNP-AC Exam to provide Moake and Melnic with CPNP-AC Exam content and successfully obtained that content and forwarded it to Melnic. Defendants then incorporated that material into Melnic's test prep course or distributed it directly to candidates for the CPNP-AC Exam. Defendants' acquisition and use of CPNP-AC Exam content, as detailed above, constitutes copyright infringement, trade secret misappropriation, and tortious interference with existing contracts.

108.    As a direct and proximate result of Defendants' combined efforts, PNCB has suffered substantially damages.

## IV.    PRAYER FOR RELIEF

WHEREFORE, PNCB respectfully prays for the following relief:

(a)    That judgment on all claims of the Complaint be entered for Plaintiff and against Defendants;

(b)    That Defendants, their heirs, agents, attorneys, representatives, assigns, and anyone acting in concert with any of them, be permanently enjoined and restrained from:

1.    Disclosing any of PNCB's exam content to anyone;

2.  Using any of PNCB's exam content in any manner;

3.  Reproducing, distributing copies of, or preparing derivative works based on any portion of any PNCB exam or otherwise infringing any of PNCB's copyrights in its exams; and

(c)  That Defendants be ordered to identify all persons who conspired or assisted them in obtaining PNCB's trade secrets and/or copyrighted materials, as well as all persons to whom they have disclosed or distributed trade secrets or copyrighted materials belonging to PNCB and to specify the information and/or materials disclosed or distributed to each such person;

(d)  That Plaintiff be awarded all damages and losses sustained as a result of Defendants' copyright infringement, misappropriation of trade secrets, and tortious interference, jointly and severally;

(e)  That Plaintiff be awarded its costs and reasonable attorney's fees;

(f)  That Plaintiff be awarded exemplary and punitive damages as a result of Defendants' willful, intentional and wrongful acts; and

(g)  That Plaintiff be awarded any further relief that the Court deems to be just and proper.

## <u>JURY DEMAND</u>

PNCB respectfully requests a trial by jury on all issues triable thereby.

RESPECTFULLY SUBMITTED:

/s/ Christopher B. Trowbridge
Christopher B. Trowbridge
ctrowbridge@bellnunnally.com
Texas Bar No. 24008182
Scott R. Larson
slarson@bellnunnally.com
Texas Bar No. 24097971

BELL NUNNALLY & MARTIN LLP
2323 Ross Ave., Suite 1900
Dallas, Texas 75201
Telephone: (214) 740-1400

Marc J. Weinstein
marc@mjweinsteinlaw.com
Pennsylvania Bar No. 206441
Florida Bar No. 151246
*Admission Pending*

MARC J. WEINSTEIN PLLC
41 University Drive, Suite 400
Newtown, PA 18940
Telephone: (215) 847-3319

ATTORNEYS FOR PLAINTIFF PEDIATRIC NURSING
CERTIFICATION BOARD